1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WASHINGTON AT SEATTLE**

9
10

CARLOS MATAMOROS, individually and on
Behalf of All Others Similarly Situated

NO.

11

Plaintiff,

**PLAINTIFF'S COMPLAINT –**
**CLASS ACTION FOR**
**DAMAGES**

12

vs.

13
14

VALVE CORPORATION, a Washington
corporation.

**DEMAND FOR JURY TRIAL**

15

Defendant

16
17
18
19

Plaintiff, Carlos Matamoros,  ("Plaintiff") on behalf of themselves and all others similarly

situated, by and through counsel, bring this action against Defendant Valve Corporation

("Defendant") and states as follows:

20

**NATURE OF THE CASE**

21
22
23
24

1.       Defendant Valve Corporation ("Valve"), headquartered in Bellevue, Washington,

develops and publishes video games, including the Counter-Strike series, Team Fortress, and

Dota. Counter-Strike 2, Team Fortress 2, and Dota 2 (the "Valve Games") are three of Valve's

most popular video games. On average, more than one million Counter-Strike, Team Fortress,

25
26

PLAINTIFF'S COMPLAINT

**MILBERG, PLLC**

and Dota players ("Players") access these games every day through Valve's gaming platform, "Steam."[1]

2.    Valve designed and operates a for-profit illegal gambling game within the Valve Games: the Loot Box Game.

3.    Players obtain Loot Boxes either while playing the Valve Games, or by purchasing them on Steam. Players must pay Valve real money to open Loot Boxes.

4.    Valve Sells Keys to open Loot Boxes ("Keys") for between $2 and $3 USD on Steam.[2]

5.    Opening Loot Boxes with a Key (the "Loot Box Game") provides Players a chance to win digital assets, created by Valve. In Counter-Strike the digital asset is frequently something called a "Skin." Skins change the appearance of a Player's weapons within Counter-Strike but have no functional impact on gameplay. Like Counter-Strike, the digital assets found in Team Fortress 2 and Dota 2 Loot Boxes contain items that allow Players to change the appearance of weapons or characters in each game.

6.    In the virtual world of Counter-Strike, Skins have become a digital expression of wealth and status. They have also become extremely valuable. Some are valued at thousands of dollars based on the rarity of the Skin. Valve controls the rarity of Skins.

7.    Playing the Loot Box Game takes place outside of Team Fortress, Dota, and Counter-Strike gameplay.

8.    The outcome of a Loot Box Game has no functional effect on gameplay in the Valve Games.

9.    The Loot Box Game gives Players the chance to win one of several digital items, the vast majority of which are low-value but some of which are extremely high value. For

---

[1]   store.steampowered.com;   https://steamdb.info/app/730/charts/;   https://steamdb.info/app/440/charts/; https://steamdb.info/app/570/charts/, last accessed March 10, 2026

[2] In Team Fortress 2 and Dota 2, Valve also sells keyless Loot Boxes, which eliminate the need for a key but still requirement payment to Valve before the Player can open the Loot Box.

PLAINTIFF'S COMPLAINT                                    **MILBERG, PLLC**

example, a Player who buys a Key for $2.99 and uses it to open a Counter-Strike Loot Box[3] has a chance, based on luck alone, to win an SSG 08 / Blood In the Water Skin that Valve values at over $400,[4] but the Loot Box more likely contains a Skin of far less value.

10.    In 2017, in response to Chinese regulatory requirements, Valve conceded that it sets the probability of which Skin a Player receives when they open a Loot Box. Valve then published the odds of winning Skins of various rarity. At least at that time, Valve stated that the odds of a Player using a Key to open a Loot Box winning the most valuable "rare and special items" was just .256%.[5]

11.    In Counter-Strike, Valve designed the Loot Box Game to look like an online slot machine. When a Player selects a Loot Box and clicks a button labeled "Use Key," Valves displays the words "Unlocking Container" and an animation in which various Skins spin right to left and slowly come to a stop. The Player receives the Skin displayed under the vertical line in the center when the animation stops. Valve then adds that Skin to the Player's Steam inventory. Similarly, in Dota 2, potential loot spins before the awarded item is revealed.

12.    Valve operates a robust market for virtual items in the Steam Marketplace and, for example, provides Players with detailed market data on the value of various Skins.

13.    Players can sell virtual items they received from playing the Loot Box Game and spend the proceeds on anything Valve sells on Steam, including video games, physical gaming hardware, and more Loot Boxes and Keys.

14.    Valve's Loot Box Game is an illegal gambling game under Washington law because Players wager things of value (Keys) and by an element of chance (using a Key to open

---

[3]    https://steamcommunity.com/market/listings/730/CS%3AGO%20Weapon%20Case%202,    last accessed March 10, 2026.

[4]    https://steamcommunity.com/market/listings/730/SSG%2008%20%7C%20Blood%20in%20the%20Water%20(Factory%20New), last accessed March 10, 2026.

[5]    https://www.csgo.com.cn/news/gamebroad/20170911/206155.shtml, last accessed March 10, 2026.

a Loot Box) are able to obtain things of value (virtual items, like Skins), which in turn can be exchanged for Valve's hardware, software, and extended Loot Box Game gameplay.

15.     By operating its illegal online gambling game, Valve violated Washington law and illegally profited from consumers. Accordingly, Plaintiff, on behalf of himself and a Class of similarly situated individuals, brings this lawsuit to recover their losses, as well as costs and attorneys' fees.

### PARTIES, JURISDICTION AND VENUE

16.     Defendant Valve is a Washington Corporation headquartered at 10900 NE 4th St., Suite 500, Bellevue, Washington 98004. Valve is authorized to conduct business and does conduct business throughout the United States.  Valve is the publisher and developer of the videogame Counter-Strike. It owns and operates the online store Steam.

17.     Plaintiff, Carlos Matamoros is an adult resident and citizen of Cape Coral, Florida and customer of Valve since 2017. He is an online player of Counter Strike 2. Since October 2024, Plaintiff Matamoros purchased and used at least fourteen (14) Keys from Defendant to open Loot Boxes in Counter Strike 2.

18.     Federal subject-matter jurisdiction exists under 28 U.S.C. § 1332(d)(2) because (a) at least one member of the class is a citizen of a state different from Defendant, (b) the amount in controversy exceeds $5,000,000, exclusive of interests and costs, and (c) none of the exceptions under that subsection apply to this action.

19.     The Court has personal jurisdiction over Defendant because Defendant conduct significant business transactions in this District, and because the wrongful conduct occurred in and emanated from this District.

20.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant Valve is located in this District and a substantial portion of the events and conduct giving rise to the claims occurred in the Western District of Washington.

## FACTUAL BACKGROUND

**A.  Valve created Skins and Loot Boxes to increase its profits from the Valve Games.**

21.    Valve has no license, permission or legal authority to create, sustain, profit from an online gambling platform.

22.    Valve has manufactured video games for nearly 20 years.  In 1999, it introduced the Counter-Strike series.

23.    Counter-Strike, formerly Counter-Strike: Global Offensive (CSGO) and now Counter-Strike 2, is a first-person shooter game created by Valve, where players can collect weapon "skins," Loot Boxes (or cases), and other items, such as stickers or gloves. These items can then be bought, sold, and traded on Valve's marketplace, Steam Community Market, and third-party marketplaces, described further below.

24.    Valve released Team Fortress 2 in 2007 and Dota 2 in 2013. Like Counter-Strike, Team Fortress 2 and Dota 2 allow Players to collect items that customize the aesthetic appearance of weapons and characters.

25.    In 2013, Counter-Strike introduced Skins, which changed the look of a player's weapons.  The announcement made was August 14, 2013 through a post on its website titled "The Arms Deal Update" ("Skins Announcement").[6]

26.    The Skins Announcement told players that "[t]he Arms Deal Update lets you collect, buy, sell and trade over 100 all-new decorated weapons that you can equip in-game."

27.    The Skins Announcement discussed how the new marketplace would work: "You can start collecting decorated weapons via timed weapon drops just by playing [Counter-Strike] on official and community servers. You can also get them by opening dropped weapon cases with the appropriate key, or by trading with other players through Steam's Trading interface. Additionally, any decorated weapons you've found, bought or traded can be sold on the Steam Marketplace."

---

[6] http://blog.counter-strike.net/index.php/2013/08/7425/ , last accessed March 10, 2026.

PLAINTIFF'S COMPLAINT                                                            **MILBERG, PLLC**

28.     This was a deliberate strategy on Valve's part.  One of its employees explained at a developer's conference in 2014 that the company determined that the "best way to get players deeply engaged in games…was to give away virtual items of random value and encourage a robust market to trade them."  That employee was quoted as saying: "This is not an accident. This is by design.  We see more blogs popping up and more and more emails from our players saying, 'I'm not really sure what happened but I've been playing DotA for the last week or two, and I made $100 selling these items that I got.'  This is hugely successful for us."[7]

29.     Valve went so far as to hire an internationally renowned economist to help it develop currencies and cross-platform economies.[8]

**B. The Loot Box Game operates in the same manner as an online slot machine.**

30.     In Counter-Strike, players use weapons while engaging in virtual warfare. The weapons are modeled on real-world analogues, such as the AK-47 assault rifle and the Desert Eagle pistol. Team Fortress 2 similarly features simulated combat with slightly less realistic weapons. In Dota 2, Players control fantasy characters from a third-person perspective and engage in team-based battles.

31.     Although Valve's games, Valve has developed a powerful model and an out-of-game marketplace for monetizing its games through features that are not integral to the actual objective of the games.

32.     In the Valve Games, Players can obtain virtual containers called Loot Boxes. These Loot Boxes contain random cosmetic items that have value ascribed to them based on their rarity, item type, and condition. One example of an item a player can obtain in a Counter-Strike Loot Box is a "skin," or an aesthetic addition that can be added to a weapon that does not affect its functionality.

---

[7]  http://www.bloomberg.com/features/2016-virtual-guns-counterstrike-gambling/, last accessed March 10, 2026.

[8]  http://www.bloomberg.com/features/2016-virtual-guns-counterstrike-gambling/, last accessed March 10, 2026.

PLAINTIFF'S COMPLAINT                                    **MILBERG, PLLC**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

33.     There are several ways a user can obtain a Loot Box in Counter-Strike. One way is for free by simply playing the game, increasing their experience points, and levelling-up their weekly profile rank. In exchange, the game may provide the player with a Loot Box as an in-game drop, which is a free item received during gameplay. Because the chances of receiving a drop increase with the amount of time spent playing the game, players are encouraged to play for longer to obtain Loot Boxes as drops.

34.     Alternatively, players may obtain Loot Boxes via the Steam Community Market. The Steam Community Market is Valve's own virtual marketplace.



PLAINTIFF'S COMPLAINT                                                      **MILBERG, PLLC**

35.    Players can buy, sell, or trade Loot Boxes on the Steam Community Market.



36.    The Steam Community Market also provides players with insights into the prices of Loot Boxes that can be bought and sold, including price history, similar to those found on stock trading platforms.



37.    In Counter-Strike, regardless of how a player obtains a Loot Box, it can only be opened using a Key, which the player must purchase from Valve in the Steam store. In Team Fortress 2 and Dota 2, Valve offers Loot Boxes that can only be opened by purchasing a Key and also sells keyless loot boxes.

38.    Key purchases and Loot Box openings take place outside of gameplay and have no effect on the actual objectives of the game.

39.    Valve generates revenue by selling keys for Loot Boxes (typically $2.49 plus sales tax). In turn, a player nearly always receives a virtual item in a Loot Box that is worth mere

PLAINTIFF'S COMPLAINT                                    **MILBERG, PLLC**

pennies. Players, however, are drawn to continue purchasing keys and opening Loot Boxes in the hopes of obtaining something of significant value.

40.    Valve's sale of keys generates significant revenue. On average, Valve generates almost a billion dollars in revenue annually from selling keys alone on Counter-Strike. In 2023, for instance, players spent $980 million on Counter-Strike keys.[9] In March 2025 alone, over 32 million cases were opened on Counter-Strike, yielding a revenue of $82 billion for Valve.[10]

41.    In Counter-Strike, the player is shown thumbnails of various Skins that could be obtained from a particular Loot Box. Underneath the thumbnails is a green button displaying the price of the key. When a player clicks on the green button, a key is purchased.[11]



---

[9] https://csgocasetracker.com/i/CS2-Case-Tracker-Year-Review-2023 (last visited March 6, 2026).

[10]    https://gaming.news/news/2025-04-08/valve-has-made-more-than-82-million-from-cs2-case-openings-in-march/?utm_source=chatgpt.com (last visited March 6, 2026).

[11] Screenshot from: https://www.youtube.com/watch?v=Pz87Q49Tw1w

PLAINTIFF'S COMPLAINT                                           MILBERG, PLLC

42.     Players are then prompted to "Unlock Container" which would remove the key from the player's inventory and open the Loot Box:[12]



43.     The look, sound and experience of opening Loot Boxes is similar to an online slot machine, as seen in the following linked video: https://girardsharp.com/wp-content/uploads/2026/03/Slot-Machine-Spinning-Graphic.mp4.[13]

44.     One of the items players can obtain from Loot Boxes is a "Skin."

45.     Specifically, in 2013, Valve updated Counter-Strike by allowing users to purchase and obtain cosmetic additions, known as "skins," for their virtual weapons. For example, a skin can transform an ordinary AK-47 into an AK-47 with distinct colors and patterns. Skins vary on the basis of rarity and other factors. As with jewels or precious metals, differences in skin rarity correlate with differences in skin value, as seen in the examples below.[14]

---

[12] *Id.*

[13] Screen recorded video from https://www.youtube.com/watch?v=tMwcgC4uIwg

[14] Screenshots from https://www.youtube.com/watch?v=v7aWySX6j7k (last visited March 9, 2026).

PLAINTIFF'S COMPLAINT                                        **MILBERG, PLLC**






46.    Like Loot Boxes, players can obtain Skins through in-game drops or can sell or purchase Skins on the Steam Community Market for funds to be used within the Steam platform.

47.    The chance of a Loot Box yielding a particular Skin is based on odds set by Valve. Valve sets those odds such that players receive rare (high value) skins in only a small percentage of Loot Box openings.[15]

48.    In addition to its scarcity, the value of a Skin is impacted by its condition, or how much wear it displays. Valve assigns a "float value" to correspond with the skin's condition. The five wear levels are: factor new, minimal wear, field-tested, well-worn, and battle-scarred. Wear levels impact the market price of a skin.

49.    Skins can provide players with high status among other players, and are therefore valuable to players.

50.    In Team Fortress 2, loot boxes contain cosmetic items or character-specific animations.

51.    In Dota 2, loot boxes contain cosmetic items for characters, including skins.

---

[15] https://sellyourskins.com/blog/csgo-cs2-case-opening-odds-drop-rates/#:~:text=2%20min%20read,has%20not%20changed%20in%20CS2, reporting on https://www.csgo.com.cn/news/gamebroad/20170911/206155.shtml (last visited March 9, 2026).

PLAINTIFF'S COMPLAINT                                                                    **MILBERG, PLLC**

52.     In both Team Fortress 2 and Dota 2, like Counter-Strike, Valve sets the odds of a loot box yielding a particular item, and players receive rare (high value) items in only a small percentage of Loot Box openings.

**C. Valve created a virtual market for virtual items, valued 1:1 with USD, that Players can spend on everything Valve sells.**

53.     Steam Community Market allows Players to buy and sell virtual items, including Skins and Loot Boxes.

54.     Valve collects a 15 percent commission when virtual items are sold on the Steam Community Market.

55.     A player who sells a virtual item through the Steam Marketplace, receives Valve's online currency "Steam Bucks" in their "Steam Wallet."

56.     For United States Players, Valve pegs the value of its online currency Steam Bucks to the United States Dollar at a 1:1 ratio. For example, $20 in Steam Bucks is equivalent to $20 USD.

57.     Other popular online games with virtual currencies do not embrace a 1:1 ratio to the USD.[16]

58.     Steam Bucks are digital store credit that (a) have the same purchasing power on Steam as United States Dollars and (b) can be used to purchase the things that Valve offers for sale on Steam, including:

      a.   Other video games on the Steam platform;

      b.   Loot Boxs, Skins, Keys, other gameplay items; and

      c.    Hardware such as Valve's VR headset or portable game console Steam Deck.

59.     On Steam, a Player cannot redeem Steam Bucks for real-world cash.

60.     Valve has created an ecosystem wherein a player is incentivized to pay Valve to obtain a Loot Box key, obtain a rare virtual item, participate in the Steam Community Market by

---

[16]  *E.g.*, https://www.minecraft.net/en-us/marketplace/buy-minecoins; https://www.fortnite.com/item-shop/v-bucks?lang=en-US.

MILBERG, PLLC

selling or purchasing the rare item, a transaction that can be expensive and from which Valve takes 15 percent of the value, and whatever funds are obtained from that transaction by the player may only be used in the Steam marketplace.

61.    A player can also buy and sell skins on third party marketplaces such as CS Float; SkinPort, and Bit Skins. Third-party marketplaces often charge lower commissions than Valve, allowing the seller to keep more of the value of their sale.

62.    Unlike on Steam, a player who sells a Skin on a third-party marketplace can receive their funds in real-world cash. The proceeds from a sale can be sent to the seller's PayPal, crypto wallet, or directly to bank accounts.

63.    Whether on the Steam or third-party marketplaces, players are incentivized to buy and sell virtual items, which have tradable market value and function as digital commodities. Their prices are driven by market demand based on interest and scarcity, which Valve controls.

64.    Keys also have value to players because they allow players to open Loot Boxes to obtain virtual items. Both the price of keys and the scarcity of virtual items, like skins, are set by Valve, and despite the fact that most Loot Boxes provide players with items worth mere pennies, players will gamble on the off-chance the Loot Box contains a rare item.

65.    Players can list virtual items for sale by selecting the item and setting a price. Steam then calculates the amount the player will receive following the sale after Valve collects its commission.

66.    The Steam platform publishes the current valuation of virtual items as well as their valuation over time, which resemble graphics typically seen on stock trading platforms.

67.    Like a real-world market, the price of a given virtual item will vary based on demand.

PLAINTIFF'S COMPLAINT                                                    MILBERG, PLLC

68.     Rare virtual items are worth more on the Steam Community Market and third-party marketplaces. Despite their steep prices, rare Skins are often sold out and unavailable to purchase.[17]

69.     The price of rare virtual can reach thousands of dollars as shown below:



_____

[17] https://steamcommunity.com/market/listings/730/AWP%20%7C%20Dragon%20Lore%20%28Factory%20New%29? (last visited March 5, 2026).

PLAINTIFF'S COMPLAINT                                              MILBERG, PLLC

70.     The price of a virtual item can also display volatility over time, as shown below:



71.     Valve is well aware that many of their users are teenagers and/or young adults. Steam's account requires users to check a box indicating they are 13 years of age or older, and does not require users to read the Subscriber Agreement before creating a Steam account:[18]

---

[18] https://store.steampowered.com/join/?

## **CLASS ALLEGATIONS**

72.    A class action is the proper forum to bring Plaintiff's claims under FRCP 23. The potential Class is so large that joinder of all members would be impracticable. Additionally, there are questions of law or fact common to the Class, the claims or defenses of the representative parties are typical of the claims or defenses of the Class, and the representative parties will fairly and adequately protect the interests of the Class.

73.    This action satisfies all of the implicit and explicit requirements of FRCP, including numerosity, commonality, typicality, adequacy, predominance and superiority.

74.    **Numerosity**: the Class is so numerous that joinder of all members is impracticable.  While the exact number is not known at this time, it is generally ascertainable by appropriate discovery.  Publicly available information indicates that hundreds of thousands of people play the Valve Games daily.

75.    **Commonality:** the claims made by Plaintiff meet the commonality requirement because they present shared questions of law and fact, and resolving these questions will resolve the classwide litigation. These shared questions predominate over individual questions, and they include, without limitation:

> a.    Whether Defendant's Loot Box Games are "gambling" as defined by RCW § 9.46.0237;

> b.    Whether Plaintiff and each member of the Class lost money or anything of value by gambling;

> c.    Whether virtual items in the Valve Games are a "thing of value" as defined by RCW § 9.46.0285;

> d.    Whether Defendant violated the Washington Consumer Protection Act, RCW § 19.86.010, et seq.; and

> e.    Whether Defendant has been unjustly enriched as a result of its conduct.

76.    **Typicality**: Plaintiff's claims are typical of those of the other Class members because Plaintiff, like every other Class member, bought Keys to open Loot Boxes.

PLAINTIFF'S COMPLAINT                                              **MILBERG, PLLC**

77.    The claims of the Class Representative Plaintiff are furthermore typical of other Class members because they make the same claims as other class members. Plaintiff has an interest in seeking compensation from Defendant.

78.    **Adequacy**: Plaintiff will fairly and adequately represent and protect the interests of the Class in that they have no disabling conflicts of interest that would be antagonistic to those of the other members of the Class. Plaintiff seeks no relief that is antagonistic or adverse to the members of the Class and the infringement of the rights and the damages they have suffered are typical of other Class members.

79.    **Superiority:** The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of class members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain class members, who could not individually afford to litigate a complex claim against large corporate defendants. Further, even for those class members who could afford to litigate such a claim, it would still be economically impractical.

80.    The nature of this action and the nature of Washington laws available to Plaintiff and the Class makes the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and the Class for the wrongs alleged. Without the class action mechanism, Defendant would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class member with superior financial and legal resources; and the costs of individual suits could unreasonably consume the amounts that would be recovered. Likewise, proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class, and will establish the right of each member of the Class to recover on the cause of action alleged; and

Individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

81.    The proposed class is described as follows:

> All persons in the United States ("National Class") who (1) purchased Keys to open Loot Boxes in connection with the Valve Games and/or (2) are parents/guardians of a minor child who purchased Keys to open Loot Boxes in connection with the Valve Games.

82.    Plaintiff reserves the right to modify or amend the definition of the proposed class and to modify, amend or remove proposed subclasses, before the Court determines whether certification is appropriate and as the parties engage in discovery.

83.    Plaintiff will fairly and adequately protect the interests of the Class. The interests of the class representative are consistent with those of the other members of the Class. In addition, Plaintiff is represented by experienced and able counsel who have expertise in the areas of tort law, trial practice, and class action representation.

84.    The class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Because of the number and nature of common questions of fact and law, multiple separate lawsuits would not serve the interest of judicial economy.

85.    Excluded from the Class are:

   a.    Defendant and any entities in which Defendant has a controlling interest;

   b.    Any entities in which Defendants' officers, directors, or employees are employed and any of the legal representatives, heirs, successors, or assigns of Defendant;

   c.    The Judge to whom this case is assigned and any member of the Judge's immediate family and any other judicial officer assigned to this case;

   d.    All persons or entities that properly execute and timely file a request for exclusion from the Class; and

PLAINTIFF'S COMPLAINT                                           **MILBERG, PLLC**

e.      Any attorneys representing the Plaintiff or the Class.

## CLAIMS FOR RELIEF

### COUNT I
**Violations of Revised Code of Washington § 4.24.070**
**(On behalf of Plaintiff and the Class)**

86.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

87.    Plaintiff, members of the Class, and Defendant are all "persons" as defined by RCW § 9.46.0289.

88.    The state of Washington's "Recovery of money lost at gambling" statute, RCW § 4.24.070, provides that "all persons losing money or anything of value at or on any illegal gambling games shall have a cause of action to recover from the dealer or player winning, or from the proprietor for whose benefit such game was played or dealt, or such money or things of value won, the amount of the money or the value of the thing so lost."

89.    "Gambling," defined by RCW § 9.46.0237, "means staking or risking something of value upon the outcome of a contest of chance or a future contingent event not under the person's control or influence."

90.    Defendant's Keys are "things of value" under RCW § 9.46.0285 because Plaintiff paid Defendants money to obtain them.

91.    Defendant's Loot Box Games are illegal gambling games because they are online games at which players wager things of value (Keys) and by an element of chance (using a Key to open a Loot Box) are able to obtain things of value (virtual items, like Skins), which in turn can be traded for Valve's hardware, software, and extended Loot Box Game gameplay.

92.    Defendant is the proprietor for whose benefit players wager Keys on Loot Boxes because it owns Counter-Strike, and operates the Loot Box Game for its own profit through the Steam store.

93.    Plaintiff and the Class gambled when they purchased Keys to wager on Defendant's Loot Boxes. Plaintiff and each member of the Class staked money, in the form of

PLAINTIFF'S COMPLAINT                                                    **MILBERG, PLLC**

1  Keys purchased with money, at Defendant's games of chance (Loot Box Games) for the chance

2  of winning additional things of value (virtual items, like Skins).

3      94.    RCW § 9.46.0285 states that a "'Thing of value,' as used in this chapter, means

4  any money or property, any token, object or article exchangeable for money or property, or any

5  form of credit or promise, directly or indirectly, contemplating transfer of money or property or

6  of any interest therein, or involving extension of a service, entertainment or a privilege of playing

7  at a game or scheme without charge."

8      95.    The virtual items Plaintiff and the Class had the chance of winning in Defendant's

9  Loot Box Game are "thing[s] of value" under Washington law.

10      96.    Players can sell the virtual items they obtain from Loot Boxes to other players on

11  Steam. Defendant provides players with:

12      a.   Its valuation of a particular virtual item at the present time in values equivalent to

13          United States Dollars;

14      b.   Its historical valuation of a particular virtual item over time, in a graphic that looks

15          like a common stock chart;

16      c.   The ability for players to list and sell their virtual items on Steam for a particular

17          price in United States Dollars;

18      d.   The ability for players to buy virtual items on Steam for a particular price in

19          United States Dollars;

20      e.   A virtual wallet ("Steam Wallet") in which to hold the proceeds of their virtual

21          item sales:

22      f.   The ability to spend Steam Wallet funds on Keys and Loot Boxes, which

23          constitutes another privilege of playing the Loot Box Game without charge;

24      g.   The ability to spend Steam Wallet funds on any virtual or real product that Valve

25          sells on Steam, including video games and video game hardware (e.g. Valve's

26          Stem Deck handheld video game console, which sells for hundreds of dollars).

PLAINTIFF'S COMPLAINT                              **MILBERG, PLLC**

97.     Defendants' online casino games are "Contest[s] of chance," as defined by RCW § 9.46.0225, because they are "contest[s], game[s], gaming scheme[s], or gaming device[s] in which the outcome[s] depend[] in a material degree upon an element of chance, notwithstanding that skill of the contestants may also be a factor therein." Defendant's Loot Boxes are programmed to have outcomes that are determined entirely upon chance and a contestant's skill does not affect the outcomes.

98.     RCW § 9.46.0201 defines "Amusement game[s]" as games where "The outcome depends in a material degree upon the skill of the contestant," amongst other requirements. Defendant's Loot Boxes are not "Amusement game[s]" because their outcomes are dependent entirely upon chance and not upon the skill of the player and because the games are "contest[s] of chance," as defined by RCW § 9.46.0225.

99.     As a direct and proximate result of Defendants' operation of its gambling game, Plaintiff and each member of the Class have lost money wagering at Defendants' games of chance. Plaintiff, on behalf of himself and the Class, seeks an order (1) requiring Defendants to cease the operation of its gambling game; and/or (2) awarding the recovery of all lost monies, interest, and reasonable attorneys' fees, expenses, and costs to the extent allowable.

**COUNT II**
**Violations of the Washington Consumer Protection Act, § RCW 19.86.010, et seq**
**(On behalf of Plaintiff and the Class)**

100.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

101.     Washington's Consumer Protection Act, RCW § 19.86.010 et seq. ("CPA"), protects both consumers and competitors by promoting fair competition in commercial markets for goods and services.

102.     To achieve that goal, the CPA prohibits any person from using "unfair methods of competition or unfair or deceptive acts or practices in the conduct of any trade or commerce. . . ." RCW § 19.86.020.

PLAINTIFF'S COMPLAINT                                    MILBERG, PLLC

103.    The CPA states that "a claimant may establish that the act or practice is injurious to the public interest because it . . . Violates a statute that contains a specific legislative declaration of public interest impact."

104.    Defendants violated RCW § 9.46.010, et seq. which declares that:

a.    "The public policy of the state of Washington on gambling is to keep the criminal element out of gambling and to promote the social welfare of the people by limiting the nature and scope of gambling activities and by strict regulation and control.

It is hereby declared to be the policy of the legislature, recognizing the close relationship between professional gambling and organized crime, to restrain all persons from seeking profit from professional gambling activities in this state; to restrain all persons from patronizing such professional gambling activities; to safeguard the public against the evils induced by common gamblers and common gambling houses engaged in professional gambling; and at the same time, both to preserve the freedom of the press and to avoid restricting participation by individuals in activities and social pastimes, which activities and social pastimes are more for amusement rather than for profit, do not maliciously affect the public, and do not breach the peace."

105.    Defendants have violated RCW § 9.46.010, et seq., because its Loot box Games are illegal online gambling games as described above.

106.    Defendant's wrongful conduct occurred in the conduct of trade or commerce—i.e., while Defendant was engaged in the operation of making computer games available to the public.

107.    Defendant's acts and practices were and are injurious to the public interest because Defendant, in the course of its business, continuously advertised to and solicited the general public in Washington State and throughout the United States to play its unlawful online

casino games of chance. This was part of a pattern or generalized course of conduct on the part of Defendant, and many consumers have been adversely affected by Defendant's conduct and the public is at risk.

108.    Defendant has profited immensely from its operation of unlawful games of chance, amassing hundreds of millions of dollars from the losers of its Loot Box Game.

109.    As a result of Defendants' conduct, Plaintiff and the Class members were injured in their business or property—i.e., economic injury—in that they lost money wagering on Defendant's unlawful games of chance.

110.    Defendant's unfair or deceptive conduct proximately caused Plaintiff's and the Class members' injury because, but for the challenged conduct, Plaintiff and the Class members would not have lost money wagering at or on Defendants' games of chance, and they did so as a direct, foreseeable, and planned consequence of that conduct.

111.    Plaintiff, on his own behalf and on behalf of the Class, seeks to enjoin further violation and recover actual damages and treble damages, together with the costs of suit, including reasonable attorneys' fees.

**COUNT III**
**Unjust Enrichment**
**(On behalf of Plaintiff and the Class)**

112.    Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

113.    Plaintiff and the Class have conferred a benefit upon Defendant in the form of the money Defendant received from them for the purchase of Keys to wager at Defendant's Loot Box Game.

114.    The purchase of the chips to wager at Defendant's Loot Box Game is and was beyond the scope of any contractual agreement between Defendant and Plaintiff and members of the Class.

PLAINTIFF'S COMPLAINT                                                    **MILBERG, PLLC**

115.   Defendant appreciates and/or has knowledge of the benefits conferred upon it by Plaintiff and the Class.

116.   Under principles of equity and good conscience, Defendant should not be permitted to retain the money obtained from Plaintiff and the members of the Class, which Defendant has unjustly obtained as a result of its unlawful operation of unlawful online gambling game. As it stands, Defendant has retained millions of dollars in profits generated from its unlawful games of chance and should not be permitted to retain those ill-gotten profits.

117.   Accordingly, Plaintiff and the Class seek full disgorgement and restitution of any money Defendant has retained as a result of the unlawful and/or wrongful conduct alleged herein.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff and members of the proposed class pray for relief and judgment against Defendants, as follows:

    a.    For an order certifying the proposed classes, appointing Plaintiff and his counsel to represent the proposed class and notice to the proposed classes to be paid by Defendant;

    b.    For damages suffered by Plaintiff and members of the proposed class;

    c.    For restitution to Plaintiff and the proposed class of all monies wrongfully obtained by Defendant;

    d.    For injunctive relief requiring Defendant to cease and desist from engaging in the unlawful, unfair, and/or deceptive practices alleged in the Complaint;

    e.    An order awarding declaratory relief, retrospective and prospective injunctive relief as permitted by law or equity, including enjoining Defendant from continuing the unlawful practices as set forth herein, and injunctive relief to remedy Defendant's past conduct;

    f.    For Plaintiff's reasonable attorneys' fees, as permitted by law;

    g.    For Plaintiff's costs incurred;

    h.    For pre-judgment and post-judgment interest at the maximum allowable rate on any amounts awarded; and

PLAINTIFF'S COMPLAINT                                    **MILBERG, PLLC**

1

i.   For such other and further relief that this Court deems just and proper under equity or law, including the award of punitive damages.

2

3   DATED this 11ᵗʰ day of March, 2026.

4

5                                    Respectfully submitted,

6                                    */s/ Douglas H. Sanders*
                                     Douglas H. Sanders
7                                    **MILBERG, PLLC**
                                     1311 Avenida Ponce De Leon, Ste 600
8                                    San Juan, Puerto Rico 00917
                                     Telephone: (516) 206-7616
9                                    Facsimile: (516) 282-7888
                                     dsanders@milberg.com

10
                                     Gary M. Klinger (*Pro Hac Vice Forthcoming*)
11                                   William J. Edelman (*Pro Hac Vice Forthcoming*)
                                     Michael A. Acciavatti(*Pro Hac Vice Forthcoming*)
12                                   **MILBERG, PLLC**
                                     227 W. Monroe Street, Suite 2100
13                                   Chicago, IL 60606
                                     Telephone: 866.252.0878
14                                   gklinger@milberg.com

15                                   Adam E. Polk (*Pro Hac Vice Forthcoming*)
                                     Simon Grille (*Pro Hac Vice Forthcoming*)
16                                   Fatima Ladha (*Pro Hac Vice Forthcoming*)
                                     **GIRARD SHARP LLP**
17                                   601 California Street, Suite 1400
                                     San Francisco, CA 94108
18                                   Telephone: (415) 981-4800
                                     Facsimile: (415) 981-4846
19                                   apolk@girardsharp.com
                                     sgrille@girardsharp.com
20                                   fladha@girardsharp.com

21

22

23

24

25

26

PLAINTIFF'S COMPLAINT                                    **MILBERG, PLLC**